Norman Perlberger, Esquire (np4025)  　　　　　　　　　　　　Attorney for Plaintiffs
PERLBERGER LAW ASSOCIATES, P.C.
PA Attorney Identification No. 15742
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
(610) 664-2440
np@perlbergerlaw.com

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**PERLBERGER LAW ASSOCIATES, P.C.**　　　　Case No. 2:21-cv-2287

**HANNA PERLBERGER**

　　　　　　　**Plaintiffs**　　　　　　　　　　　　**COMPLAINT**
　　　　　　　　　　　　　　　　　　　　　　　　　　**JURY TRIAL DEMANDED**

vs.

**WELLS FARGO BANK, N.A.**

　　　　　　　**Defendant**

### I.　　PARTIES

1. Plaintiff, PERLBERGER LAW ASSOCIATES, P.C. (hereinafter, "PLA") is a professional corporation organized under the laws of the Commonwealth of Pennsylvania, engaged in the practice of law, with its primary place of business at Two Bala Plaza, Suite 300, Bala Cynwyd, PA 19004.

2. Plaintiff, HANNA PERLBERGER, Individually, is a citizen of the State of Florida, residing therein at 18671 Collins Avenue, Unit 1903, Sunny Isles, FL 33160. She is also the sole shareholder of the hereinafter identified co-Plaintiff, Perlberger Law Associates. P.C.

3. Defendant WELLS FARGO BANK, N.A. (hereinafter, "Wells Fargo") is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota.

## II. JURISDICTION AND VENUE

4. Plaintiffs and Defendants are citizens of different states, and on the basis of diversity of citizenship with the amount in controversy being in excess of $75,000, jurisdiction lies under 28 U.S.C. §1332.

5. Venue lies in this District, pursuant to 28 U.S.C. §1391b (2), in which a substantial part of the events or omissions giving rise to the claim occurred.

## III. OPERATIVE FACTS

6. On June 8, 2020, a man identifying himself as Julio Gomez, President of TOOLS & EQUIPMENT SUPPLY, LLC., with a corporate address at 5625 NW 79th Street, Doral, FL 33166 [Direct Tel: (305) 203-1280] contacted PLA, seeking legal representation in order to collect on a debt, purportedly owed by a customer, Derbyshire Machine & Tool Co., a company based in Philadelphia, to whom equipment had been sold, but not paid for. The amount of the debt was purported to be $199,550.00. Mr. Gomez indicated that he had located PLA as an experienced litigation firm, with licensed attorneys in Pennsylvania and Florida.

7. This initial contact was by telephone and then followed up with a series of emails, transmittal of a fee agreement, and a request that, before initiating suit, Derbyshire be

informed that, short of immediate payment of the full amount, litigation would follow, in which legal fees would be demanded.

8. Undersigned counsel, who took the initial call and engaged in follow-up communications, did a Google search on both entities and found them to be active companies at the addresses disclosed to PLA.

9. Without instituting suit, Derbyshire wrote the attached letter on June 15, 2020, and accompanied said letter with a purported Citibank issued bank check in the amount of $199,550.00, made out to PLA (copies of the referenced letter and check are attached hereto as Exhibit "1").

10. On June 17, 2020, the Citibank check was deposited into the PLA Operating Account at Wells Fargo (copy of relevant portion of online statement is attached as Exhibit "2").

11. The circumstances of said deposit, in retrospect were unusual and led to the failure on the part of Wells Fargo to follow its own internal policies:

12. Plaintiff Hanna Perlberger went to the Levering Mill Rd Bala Cynwyd PA branch office at Well Fargo, where she customarily banked near her then residence at 330 Linden Lane, Merion Station, PA 19066.

13. Because of COVID-19, bank representatives would not permit entry into the branch office, and a bank officer, Jennifer Gils, instructed Plaintiff to use the ATM machine with the Debit Card provided by Wells Fargo. This direction was made despite Plaintiff informing said bank officer the large amount of the check to be deposited. According to bank policy, the Debit Card could only accept deposits into the Operating Account, and not the IOLTA account where such checks prior to distribution would be deposited had it been presented to a bank teller inside the branch.

14. Unbeknownst to Plaintiffs but learned through subsequent conversations with Wells Fargo representatives (assigned to investigate the claim described hereunder), when checks are deposited thru an ATM machine (at least under COVID-19 protocol, if not generally), they are picked up by a truck and taken to another Wells Fargo facility for processing.

15. It is unknown at this time, but it is averred upon investigation, that the automated deposit of the Citibank check resulted in a substitute electronic check transmittal to Citibank for collection. Where the original check may be at the filing of this Complaint is unknown, but will be a subject of discovery, so that it may be independently examined for its authenticity.

16. PLA then received wiring instructions from Gomez, and upon learning through online banking that the funds had "cleared", Plaintiff Hanna Perlberger called for an appointment to wire the net funds of $197,050.00, as instructed. She was informed that there were no available appointments at the Bala Cynwyd branch, but that the Rosemont branch could set up the appointment in order to wire the funds.

17. Plaintiff Hanna Perlberger then met with a bank officer with whom the appointment was set at the Rosemont branch office. Said officer reviewed the printed wiring instructions provided by Gomez which Plaintiff presented, asked Plaintiff "is this all the numbers you have", and told her that he had to "check out" the wiring codes on said instructions. He left the room and came back and said "it's fine", and then wired the funds as instructed on June 18, 2020 (a copy of the wire transfer confirmation is attached as Exhibit "3").

18. Unbeknownst to Plaintiffs, Wells Fargo wired the funds thru Citibank, as correspondent bank, to a supposed bank client, which acted as a conduit for said wired funds. The ultimate destination of said wire funds, which were evident to Defendant (but not to Plaintiffs), was Guaranty Bank in Nigeria.

19. At the time of the wire transfer, there were insufficient funds in the PLA Operating Account to cover the amount of the wired funds, i.e., $160,245.34 (Exhibit "2").

20. This transaction was therefore contrary to the internal banking policies of Wells Fargo, which explicitly provide that deposited funds will be held when, *inter alia*, there are: "High-dollar deposits that exceed the total available balance in the account."

21. On June 22, 2020, after all the events described above had taken place, Wells Fargo issued a letter (mailed on 6/23/2020), that Wells Fargo was "delaying the availability of the funds, because the "signature on the [6/17/2020] check was forged" (copies of the Wells Fargo letter & envelope showing when it was mailed to PLA are attached hereto as Exhibit "4"). Said letter goes on to say:

> We will be holding these funds until the date(s) indicated above. A hold means that although the check amount is credited to your account, the funds are not available for your use (please refer to the last page of this letter for more information about a hold on your account). To help avoid overdrawing your account and incurring overdrafts and/or returned item (non-sufficient funds/NSF) fees, during this time please do not make withdrawals or write checks against these funds (if your account allows check writing). Overdraft fees do not apply to prepaid cards.
>
> If the check(s) listed above is returned, we will mail a notice to you the same day and deduct the amount of the check(s) from your account. A deposit item return fee will also be deducted from your account for each check returned (unless your account does not assess a fee for returned checks). Please refer to your account Fee and Information Schedule for the amount of the fee.
>
> We understand the inconvenience that can occur when a check is returned. If you have questions regarding the availability of funds, please refer to the information on the last page of this letter or contact one of our representatives at the telephone number printed on your monthly account statement.

22. On June 23, 2020, Wells Fargo debited the Operating Account in the amount of the deposited check, i.e., $199,550, which resulted in an Overdraft and a "return deposited item fee" of $12.00 (copy of transactions attached hereto as Exhibit "5").

23. To cover the Overdraft and have sufficient funds in which to operate on an interim basis, Plaintiff Hanna Perlberger advanced $50,000 of her own funds as a loan to the firm.

24. At the time of the above transactions, including the wire transfer and returned check, the funds in the Operating Account were comprised of the balance of funds that had been loaned to PLA thru the SBA

in the respective amounts $25,887 (PPP) and $149,900 (COVID relief). These loans were deposited into the Wells Fargo Operating Account on 5/21/2020 and 5/27/2020, respectively (Exhibit "2").

25. Wells Fargo is the SBA-designated Lender for the deposit and accountability, including forgiveness of debt, of the subject funds.

26. Up until the fraud perpetrated upon Plaintiffs, said funds had been utilized for normal and regular operating expenses, permitted by the SBA, including but not limited to the payment of salary thru ADP of Plaintiff Hanna Perlberger (Exhibit "2").

27. As a result of the losses suffered by PLA as alleged and described above, the SBA funds, which were to be utilized by PLA for the permissible purposes for which said funds were loaned, disappeared thru the negligent and reckless conduct of the Defendant, as more fully set forth in the Counts hereunder.

28. Because both the SBA funds and PLA's Operating Account were managed by Wells Fargo, at the time of the transactions described above, Wells Fargo knew the source of available funds, knew that there were insufficient funds to cover a forged check of the large amount involved, and nevertheless permitted said transactions to occur to the detriment of Plaintiffs.

29. It is believed and alleged (as more fully set forth hereunder) that Defendant knew or had reason to know that the large amount of the check and the transmission of wired funds to the Guaranty Bank in Nigeria was suspect, fraudulent and part of a money laundering scheme, which it is further alleged Defendant had prior and ongoing transactions involving said Nigerian bank through the wiring of funds through correspondent banks such as Citibank, making it evident that the transactions in which Plaintiffs were unknowingly drawn into were fraudulent and aimed at laundering such monies in an unlawful fashion.

30. Upon receiving notice that the Citibank check had been forged and returned to Wells Fargo, and that the PLA account was debited the amount of the check plus a return fee, resulting in an Overdraft then covered by Plaintiff Hanna Perlberger, undersigned counsel reached out to both Wells Fargo and Citibank's fraud units lodging a complaint with each bank on June 23 (Wells Fargo) and on June 24, 2020 (CITI).

31. Plaintiff Hanna Perlberger went to the branch office in Bala Cynwyd on June 24, 2020, and met with Jonathan Hoffman, Assistant Vice-President, seeking to establish a dedicated operating account so that the tracking of expenses could be documented to establish that PLA funds going forward would be utilized in accordance with the SBA's guidelines, and forgiven to the extent permitted.

32. Mr. Hoffman told her "there's no point opening the account since the funds are now gone due to the scam . . . nothing to put in it . . . hate to tell you that the money is gone." He went on to say: "You should have waited after depositing check, even though funds were made available. We had no way of knowing it was counterfeit."

33. Plaintiffs had ongoing communications with bank representatives purporting to resolve the loss, some of whom expressed sincere empathy and a desire to help Plaintiffs retrieve the lost funds. Plaintiffs have detailed memoranda memorializing the dates, persons and contents of all such communications. They all, however, culminated in a declination of reimbursement of the seized funds.

## **COUNT I – BREACH OF FIDUCIARY DUTY**

34. Plaintiffs hereby incorporate the averments set forth in paragraphs 1-33.

35. In acting as a lender and agent of SBA funds borrowed by Plaintiff PLA, Wells Fargo had a fiduciary duty to monitor, protect and guard against an unlawful dissipation by a third party.

36. As the bank accepting the deposit of the disputed check, Wells Fargo had a fiduciary duty to detect the fraudulent nature of the check, unknown and unappreciated by P  Plaintiffs, before clearing the check for further transactions.

37. Congress enacted two laws which were designed to both make deposited funds available to consumers and to protect depositors from fraudulent, counterfeit, or false checks before said depositors act to their detriment in relying on the validity of such checks. These laws are known as the Expedited Funds Availability Act, which became effective in September 1988 ("EFA") and Check Clearing for the 21st Century Act ("Check 21"), which became effective in October 2004.

38. Regulation CC (12 CFR 229), as amended, implements the EFA and Check 21 Acts. The regulation sets forth the requirements that depositary institutions make funds deposited into transaction accounts available according to specified time schedules and that they disclose their funds availability policies to their customers. It also establishes rules designed to speed the collection and return of checks and electronic checks and describes requirements that affect banks that create or receive substitute checks, including requirements related to consumer disclosures and expedited recredit procedures.

39. Under the Availability schedule set forth in §229.12, which became effective in September 1990 funds deposited at nonproprietary ATMs, including cash and all checks, must be made available no later than the fifth business day following the banking day on which they were deposited.

40. These statutes and regulations set forth Exceptions to the normal rules permitting withdrawal of funds in short time periods after deposit. These are found in Section 229.13, which allows banks "to exceed maximum hold periods specified in the availability schedule." As the Regulation provides, these exceptions are "considered 'safeguards' because they offer banks a means of reducing risk based on the size of the deposit . . . or a belief that the deposit may not be collectible."

41. The beneficiary of this safeguard is the consumer/customer of the bank, who relies on bank policies to employ these safeguards to avoid successive transactions (in this case, the wiring of funds) of large sums of money known to be received by a foreign individual, entity or country, through a suspect bank. Here, the known recipient of the funds was the Guaranty Bank of Nigeria, and the "customer" of Citibank was reasonably suspect to be nothing more than a conduit for illegal funds.

42. Under the Acts, a large deposit is identified as *deposits over $5,000) (§ 229.13(b))*.

43. Under the Acts, "reasonable cause to doubt collectability" provision *(§ 229.13(e))* is applied. when the depositary institution must have reasonable cause to believe that the check is not collectible and must disclose the basis for the extended hold to the customer. The basis for reasonable cause may include, for example, communication with the paying bank indicating that. a stop-payment order has been placed on the check; there are insufficient funds in the drawer's account to cover the check; and/or the check will be returned unpaid.

44. If the depositary bank intends to use this exception, it must notify the customer, in writing, at the time of deposit. If the deposit is not made in person or the decision to place the hold is based on facts that become known to the bank later, the bank must mail the notice by the business day after the day the deposit is made, or the facts become known. The notice must indicate that availability is being delayed and must include the reason the bank believes the funds are uncollectable. If a hold is placed on the basis of confidential information, as when check kiting is suspected, the bank need only disclose to the customer that the hold is based on confidential information indicating that the check may not be paid.

45. If the depositary bank discovers a reason to delay the funds after the time the notice should have been given, the bank must notify the customer about the hold as soon as possible, but no later than the business day after the facts become known.

46. Allegations 37-45 set forth rules and regulations that, on their face, do not impose mandatory obligations upon the banks, but are discretionary in nature; however, consistent with same, Wells Fargo adopted its own published guidelines for various "holding periods" and made them known to the public, including Plaintiffs. They read, in relevant part:

> A deposit hold means that although a check amount was credited to your account, it's not available for your use. Wells Fargo Bank's general policy is to make deposited funds available on the first business day after the Bank receives a deposit. In some cases, however, we may place a deposit hold on these funds and delay availability for up to 7 business days. Common reasons for placing a hold on a check or deposit include but are not limited to:
>
> - Accounts with frequent overdrafts
> - New customer
> - High-dollar deposits that exceed the total available balance in the account
> - Deposits of checks that have already been returned unpaid
> - Notification to Wells Fargo by the check maker's financial institution that the check will be returned

47. In the instant case, the deposit was made, at the direction of the bank teller and allegedly, because of the COVID-19 restrictions at the branch office, by means of the ATM machine outside the branch office. As such, it was not examined by a local bank teller or official, but rather picked up by a truck and taken to a central facility.

48. Because of the size of the check and that it was not drawn on a local bank, it should have been held for the five-day period at the earliest, and the funds should not have been available for the additional reason that there were insufficient funds in the PLA account to cover the amount of the check if it proved to be necessary to have it dishonored as a returned item.

49. Bound by the Exceptions provision of the above Acts, Wells Fargo sent out the notice letter (Exhibit "4", which was dated June 22nd (mailed on June 23rd), supposedly delaying "availability of funds because the "signature on the [6/17/2020] check was forged".

50. To the detriment of Plaintiffs, however, Wells Fargo informed PLA that the funds were available the day after deposit and transacted the wire transfer on June 18, 2020.

51. Because the funds were, at the direction of the bank teller, deposited into an ATM machine at the Bala Cynwyd branch, no one examined the original check, and it is believed that a "substitute check" was transmitted to Citibank, which had purportedly issued the check, for payment.

52. Because of this process, instituted because of COVID restrictions set by the branch office, Wells Fargo failed to employ its fraud detection practices and policies, which it also touted to the general public and to Plaintiffs as being in place to detect, flag and prevent fraudulent bank transactions through the use of either counterfeit or forged instruments. The relevant portions of Wells Fargo's published detection practices reads:

At Wells Fargo, the security of your assets is a top priority, and we're committed to protecting your company's financial information and assets. We're proactively advancing our security to identify new threats and help ensure the safety of your accounts and information. We use multiple layers of protection to keep your company's information and accounts secure.

As fraud becomes more sophisticated, so does our approach to security — and our investment in advanced security tools using the latest technology helps us protect your accounts and information and detect when there may be a risk.

Here are some of the ways Wells Fargo helps you protect your accounts from online fraud.

## Fraud protection

- **Layered security approach.** We require tokens for high-risk functions such as money movement and user Administration.

- **Data encryption.** To help prevent unauthorized access, your information is coded. All Wells Fargo online banking operations use advanced encryption methods.

- **Credential protection.** To protect the privacy of your confidential log-on information, Wells Fargo will never ask for your sign-on credentials or passwords over the phone or through e-mail or text messages.

- **Session management.** To help securely manage your online sessions, the *Commercial Electronic Office*® (*CEO*®) uses separate windows, never pop-up windows. Pop-up windows launch automatically and carry higher security risk.

- **Product security.** To strengthen your control of crucial information and help safeguard your data, Wells Fargo builds advanced security features into all products and services. For example, you can establish wire transaction dollar limits at the company level, account level, and user level. If a transaction amount exceeds any of these limits, the payment cannot be sent.

- **Products, services, and controls.** Wells Fargo offers several fraud protection services to help protect you against online fraud, including the Perfect Receivables® service for ACH and wire transfers, Dual Custody for services with transactions that require strong authentication, Alerts for receiving critical alerts about your accounts, and the Fraud Manager solution, available through *CEO*. Fraud Manager organizes the ACH Fraud Filter, Positive Pay, and Add Check Issues fraud prevention solutions into a consolidated location to

help fight fraud. Individually, these services allow you to make pay or return decisions on your ACH and positive pay transactions.

### Fraud detection

- **Advanced technology, monitoring, and risk evaluation.** Wells Fargo employs multiple methods for detecting suspicious transactions and fraud. They look for out-of-pattern behavior and other suspicious activities occurring at the time of log-on or at transaction submission. Many of these methods are undetectable by the users of our internet and mobile portals and by the fraudsters themselves.
- **Industry partnership.** We work closely with anti-phishing and anti-trojan vendors and actively share fraud forensic data within the industry.
- **Law enforcement coordination.** Wells Fargo collaborates with law enforcement agencies to share intelligence and investigate all fraud incidents that could affect our customers.

53. In failing to employ its own practices and procedures, Wells Fargo breached its fiduciary duty to PLA as lender of SBA funds, and this breach caused Plaintiffs the economic losses set forth in allegations 19-24.

54. When Plaintiff appeared at the Rosemont branch, believing from her account status that the funds were available and had cleared, Wells Fargo had a duty to prevent the fraudulent wire transfer it then executed, which then, upon Citibank's rejection of the substitute check, caused Wells Fargo to charge back the wired funds against the PLA account, and demand both overdraft coverage by Plaintiff and the imposition of a return fee.

55. The actions of Wells Fargo, as fiduciary of the borrowed SBA funds, fall outside the normal "ordinary care" standard afforded banks under the Pennsylvania Uniform Commercial Code ("PUCC").

56. Its actions constitute negligence and reckless indifference to its customer-borrower and entitle Plaintiffs to both compensatory and punitive damages.

WHEREFORE, Plaintiffs demand judgment against Wells Fargo for $250,000 in compensatory damages, including lost interest, and punitive damages in an amount determined reasonable and appropriate.

## **COUNT II – VIOLATION OF ARTICLES 3 & 4 OF PUCC**

57. Plaintiffs hereby incorporate by reference paragraphs 1-33 as if they were fully set forth fully hereunder.

58. Wells Fargo, at all times relevant, had a relationship with Plaintiffs that was tantamount to both principal-agent and creditor-debtor, with respect to funds deposited into the PLA and Hanna Perlberger accounts.

59. Under the section 3103 (PUCC), Wells Fargo had a duty of ordinary care as it involved the processing for collection or payment of funds by automated means, where teller contact was restricted by branch policies, and in so doing, ordinary care involved the use of commercial standards either applicable to all national bank associations and/or its own internal policies known to its customers, on which reliance was founded.

60. A failure to exercise ordinary care, under section 3404(d) imposes liability to the extent that a forged or counterfeit check is presented for deposit, transacted by the innocent customer, and the bank failed to use commercially available tools to detect the fraudulent check and to hold it beyond the minimum period to ascertain its authenticity, especially when the check is for the large amount involved in this case, and where the account had insufficient funds to cover the loss if the check were dishonored.

61. In accepting a check for deposit, executing the wire transfer, or transacting funds purportedly represented by the presented check, Wells Fargo assumed transfer & encoding warranties under sections 3416, 4207, 4208 & 4209 (PUCC) to its depositor and to the transferee (Citibank), that "all signatures on the instrument are authentic and authorized", and that "the instrument has not been altered".

62. Wells Fargo breached the aforesaid warranty provisions of the PUCC, causing Plaintiffs harm, and as such, is responsible to Plaintiffs for the loss of $250,000.

63. Wells Fargo violated U.C.C. § 4-401(1) in taking money out of its customer's account to pay an item when it was not properly payable.

64. Under section 4401(b), Wells Fargo was not entitled to charge back or seize funds in PLA's account, where PLA did not benefit from the proceeds of the item.

65. Wells Fargo failed to utilize its published security procedures, and in so doing violated section 4A202 (PUCC), in that commercially reasonable measures were not employed, nor its own policies, in protecting Plaintiffs from the fraudulent check and improper wire transfer of said funds, without employing encoding and fraud detection software and policies that existed under the Bank Secrecy Act and its implementing regulations.

66. To the extent not displaced by the PUCC, the Electronic Transfer Act (EFTA) governs to the extent of any inconsistency in the EFTA and the PUCC. Section 4A108 (PUCC).

67. Wells Fargo had a duty under the EFTA to flag, detect and prevent the transfer of funds through a wire transfer by means of a correspondent bank (i.e., Citibank), to a known or suspected money laundering/terror person, entity or beneficiary bank, i.e., Guaranty Bank of Nigeria, the identity of which was known to Wells Fargo by means of the encoding information in the wire transfer instructions.

68. The amount of the wire transfer, the unlikely association with Plaintiffs, and the suspected destination of the funds should have caused Wells Fargo to delay the transaction until the fraudulent check had been honored by Citibank.

69. As a proximate and direct cause of Wells Fargo's multiple violations of the PUCC, Plaintiffs are entitled to compensatory and consequential damages, including loss of SBA loaned funds and lost interest, totaling approximately $250,000.

70. Bad faith and/or reckless disregard of Plaintiff's property interests in bank funds maintained as well as its charge back upon the return of the counterfeit/forged item, renders Wells Fargo liable for punitive damages pursuant to section 4103(3)(PUCC).

WHEREFORE, Plaintiffs demand judgment against Wells Fargo for $250,000 in compensatory damages, including lost interest, and punitive damages in an amount determined reasonable and appropriate.

## COUNT III – COMMON LAW REMEDIES

71. Plaintiffs hereby incorporate by reference paragraphs 1-33 as if they were fully set forth fully hereunder.

72. PUCC provides in section 1103(b):

> "Unless displaced by the particular provisions of this title, the principles of law and equity, including the law relative to . . . principal and agent, estoppel, fraud, misrepresentation . . . supplement its provisions."

### A. Conversion & Unjust Enrichment

73. Defendants, by seizing funds from the PLA Operating Account, and refusing to reimburse Plaintiffs for their losses caused by Defendants' wrongdoing, have converted to their own

use and benefit monies belonging rightfully to Plaintiffs, and have been unjustly enriched by virtue of their conduct.

74. The afore-described conduct was malicious, reckless and in wanton disregard of the harm, both actual and consequential, it brought upon the Plaintiffs.

75. As a result of their conversion and unjust enrichment, Defendants caused Plaintiffs severe and serious financial harm.

76. , Plaintiffs have suffered the following direct financial losses: seizure of the funds available on the date the illegal check was returned, i.e., $160,245.34; return fee of $12.00; monies advanced by Plaintiff Hanna Perlberger in the amount of $50,000 to cover the Overdraft, i.e., the bank debited PLA account $199,550, and funds in the amount of $50,000 were deposited to cover the Overdraft and provide minimal funds for continued operation of PLA; loss of use of SBA loan proceeds which had been deposited into the PLA Operating Account at Wells Fargo; jeopardization of loan forgiveness of SBA loan(s) by the unavailability of loan funds to be used for authorized payroll and operating expenses.

77. In addition to the actual damages, plaintiffs are entitled to punitive damages to deter Defendants from the same or similar conduct in the future.

### B. Breach of Contract

78. Plaintiffs are long-time customers of Wells Fargo, maintaining personal accounts, business accounts and other financial vehicles offered by Wells Fargo.

79. As customers and depositors of personal and business funds, Wells Fargo owes a contractual duty to Plaintiffs in discharging its responsibilities as a banking institution.

80. This contractual duty includes, *inter alia:*

a. Professional management of Plaintiffs' accounts.

b. Accepting deposits of checks, either thru a bank teller or ATM machine, when presented by Plaintiffs, ONLY if the checks are genuine and authentic.

c. Verifying all presented checks and holding them for periods of time necessitated by governing policies that consider the size of the deposited check, its source, the availability of funds in the depositor's account to cover any subsequent withdrawal, and the duty to disclose and notify customers when a given check is suspect or subject to dishonor and return.

d. Verifying all codes and wiring instructions to make certain that suspicious transfer of funds overseas is not part of illegal, corrupt and criminal activities, including but not limited to money-laundering.

e. Matching the prospective recipient of wired funds to FATF lists of suspicious institutions and countries.

f. Refraining from releasing funds on a deposited check in a large amount where insufficient funds exist in the depositor's account, until it is determined that the check is authentic and may be negotiated without loss to the depositor.

g. Investigating, disclosing and notifying its customers all transactions that could result in financial loss to the depositor, relying on the declaring funds available, when they are not.

h. Employing security and fraud detection measures that it advertised and represented to its customers were in place to avoid losses caused by presentation of fraudulent checks.

i. Holding large deposits when there were insufficient funds in its customer account before subsequent wire transfer is executed, to insure that the check deposited into an ATM machine and transmitted by means of a substitute check to the supposed issuing bank for payment was honored.

j. Reimbursing its customers for losses caused by Wells Fargo in the discharge of its contractual duties.

k. Breaching the warranties imposed upon it by the PUCC (as more particularly set forth in Count I of this Complaint.

81. By failing to perform its contractual obligations to Plaintiffs, Wells Fargo proximately caused Plaintiffs the following direct financial losses: seizure of the funds available on the

date the illegal check was returned, i.e., $160,245.34; return fee of $12.00; monies advanced by Plaintiff Hanna Perlberger in the amount of $50,000 to cover the Overdraft, i.e., the bank debited PLA account $199,550, and funds in the amount of $50,000 were deposited to cover the Overdraft and provide minimal funds for continued operation of PLA; loss of use of SBA loan proceeds which had been deposited into the PLA Operating Account at Wells Fargo; jeopardization of loan forgiveness of SBA loan(s) by the unavailability of loan funds to be used for authorized payroll and operating expenses.

WHEREFORE, Plaintiffs demand judgment against Wells Fargo for $250,000 in compensatory damages, including lost interest, and, should Wells Fargo be found liable for conversion and unjust enrichment, Plaintiffs demand punitive damages in an amount determined reasonable and appropriate.

_____
Norman Perlberger, Esquire
Attorney for Plaintiffs