# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PERLBERGER LAW ASSOCIATES, P.C., | : | |
| HANNA PERLBERGER | : | |
|            Plaintiffs, | : | CIVIL ACTION |
| | : | No. 21-2287 |
|            v. | : | |
| | : | |
| WELLS FARGO BANK, N.A., | : | |
|            Defendant. | : | |

**McHUGH, J.**                                                                                                                                          **July 19, 2022**

## MEMORANDUM

      This case arises out of an unusual check fraud scheme. A law firm accepted an assignment to collect a debt on behalf of a new client, ostensibly a tool company in Florida. After Plaintiffs demanded payment of the outstanding bill, a check for the full amount was quickly tendered, which Plaintiffs deposited with Defendant Wells Fargo. Upon notice that the funds were available, Plaintiffs authorized distribution to its purported client, but unbeknownst to Plaintiffs, their "client" instructions were to wire the money—almost $200,000—not to Florida, but to a Nigerian bank. The check was, in fact, forged. When the forgery was discovered, Wells Fargo debited Plaintiffs' account in the amount of the wire. This lawsuit against Wells Fargo followed.

      I previously granted Defendant's Motion to Dismiss as to all claims except Plaintiffs' breach of contract claim, holding that discovery was necessary to ascertain whether any contractual terms might be implied through the parties' conduct. With discovery complete, the bank now moves for summary judgment as to the last remaining claim. Because the banking relationship is governed by the terms of express contracts which Wells Fargo did not breach, and there is not

legal or factual basis on which Plaintiffs can prevail under a theory of implied contract, I am compelled to grant Defendant's motion.

I. **Factual Record**

    *a. Agreements between Plaintiffs and Wells Fargo*

Plaintiff Hanna Perlberger is the President and owner of Plaintiff Perlberger Law Associates, P.C. ("PLA"). H. Perlberger Dep. 5:4-7 (April 7, 2022), Mot. Summ. J., Ex. A, ECF 31-3. Her husband, Norman Perlberger, is the Secretary Treasurer of PLA. N. Perlberger Dep. 7:19-21 (March 29, 2022), Mot. Summ. J., Ex. B, ECF 31-4. On March 21, 2014, Perlberger Law Associates, P.C. ("PLA") opened two business accounts with Wells Fargo: an Operating Account ending in 5799 and an IOLTA Account ending in 4479. *See* Business Account Application, Mot. Summ. J., Ex. C, ECF 31-5; H. Perlberger Dep. 21:14-22:2, 34:4-35:20. Both Hanna and Norman Perlberger signed the Business Account Application on PLA's behalf and agreed to the Certificate of Authority on page four of the application. Business Account Application; H. Perlberger Dep. 21:14-22:2, 34:4-35-17. The Certificate of Authority provides that PLA's "use of any [Wells Fargo] deposit account, product or service will confirm [PLA's] receipt of, and agreement to by bound by, the Bank's applicable . . . account agreement. . . ." *Id*. at 4. PLA used both accounts regularly. H. Perlberger Dep. 45:3-47:2; N. Perlberger Dep. 41:10-42:2. Neither Hanna nor Norman Perlberger recall being given the Business Account Agreement or being informed orally as to the contents of the Agreement at the time that they opened the account.[1] H. Perlberger Dep. 32:11-33:11; 47:5-48:1; N. Perlberger Dep. 35:14-37:4.

---

[1] Plaintiffs assert in their brief that "When asked if either received a copy of the Business Account Agreement (not part of the Application) or were informed orally about the policy disclosures and waivers of liability contained in this unsupplied document, both deponents denied such oral or written disclosures. Both testified that they were only given blank checks and a copy of the Application." Pl.'s Resp. at 5. The record is less definitive on this point than represented by Plaintiffs' brief. Rather than denying that she received the agreements, Ms. Perlberger testified that she did not recall being given the Agreement or being

At the time that Plaintiffs opened the account, a 2013 Business Account Agreement was in effect. It expressly provided that Wells Fargo could modify the Agreement: "The Bank may in its sole discretion from time to time change this Agreement by adding new provisions or by modifying or deleting existing provisions." Business Account Agreement, Mot. Summ. J., Ex. D at 114, ECF 31-6.[2]

In 2019, Wells Fargo modified the Agreement and adopted the Deposit Account Agreement, effective July 24, 2019. Deposit Account Agreement, Mot. Summ. J., Ex. F, ECF 31-8. The Agreement provides that by "using your account or services you agree to this Agreement." *Id*. at 6. It states that Wells Fargo is responsible for "exercising ordinary care and complying with the Agreement." *Id*. at 18. It further provides:

> Except to the extent we fail to exercise ordinary care or to comply with the Agreement, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses (including attorney's fees and expenses) arising out of or in any way connected with our performance under the Agreement. You agree this indemnification will survive termination of the Agreement.

*Id*.

The Deposit Agreement addresses the handling of deposits and the procedure when a deposit is returned unpaid. It expressly notes that when an item is processed by "automated means, ordinary care does not require us to examine the item." *Id*. When a deposit is returned unpaid, it states:

---

informed about it orally. She believes that she only received "a few pieces of paper" that fit into the small pocket on her car door and that she doesn't "recall much else in there" other than what she signed and blank checks. H. Perlberger Dep. 32:11-33:16. Norman Perlberger stated that he thinks he received some blank checks and a copy of the signed document and that he knows that they also "give out these brochures" when accounts are opened. N. Perlberger Dep. 29:18-24. He also stated that the Wells Fargo employee "may have" given him a disclosure document with terms and conditions, but later testified that he does not recall receiving the account agreement and that "[n]o one discussed with us an agreement, a contract or anything other than this deposit slip that we signed." *Id*. at 30:8-15; 36:18-37:21.

[2] Throughout this opinion, pin citations to the 2013 Business Account Agreement and 2019 Deposit Account Agreement use the WF Bates numbers.

> We can deduct the amount of the deposited or cashed item from your account (or any other account you maintain with us). We can do this when we are notified that the item will be returned. We do not need to receive the actual item (and usually do not receive it). We can do this even if you have withdrawn the funds and the balance in your account is not sufficient to cover the amount we hold or deduct and your account becomes overdrawn. In addition, we will charge you all applicable fees and reverse all interest accrued on the item. We may place a hold on or charge your account for any check or other item deposited into your account if a claim is made or we otherwise have reason to believe the check or other item was altered, forged, unauthorized, has a missing signature, a missing or forged endorsement, or should not have been paid, or may not be paid, or for any other reason. When the claim is finally resolved, we will either release the hold or deduct the amount of the item from your account. We are not legally responsible if we take or fail to take any action to recover payment of a returned deposited item.

*Id*. at 24.

Finally, the Deposit Agreement also includes information about a customer's ability to withdraw funds, funds availability following deposit, when fund availability may be delayed, and how to determine an account's available balance. It provides the following:

> **Your ability to withdraw funds**
> Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each an account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposits.
> . . .
> **Longer delays may apply**
> In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:
> • We believe a check you deposit will not be paid
> • You deposit checks totaling more than $5,000 on any one day
> • You redeposit a check that has been returned unpaid
> • You have overdrawn your account repeatedly in the last six months
> • There is an emergency, such as failure of computer or communications equipment
>
> We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.
> . . .
> **How do we determine your account's available balance?**

4

> Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to authorize your transactions during the day (e.g., debit card purchases and ATM withdrawals). We also use the available balance to pay your transactions in our nightly processing. We calculate your available balance as follows:
> • We start with the ending daily account (posted) balance from our prior business day nightly processing that includes all transactions deposited to or paid from your account.
> • We subtract from this amount any holds placed on a deposit to your account and any holds placed due to legal process.
> • We add pending deposits that are immediately available for your use (including cash deposits, electronic direct deposits, and the portion of a paper check deposit we make available; see "Funds availability policy" section for details).
> • We subtract pending withdrawals that we have either authorized (such as debit card purchases and ATM withdrawals) or are known to us (such as your checks and preauthorized automatic ACH withdrawals that we receive for payment from your account) but have not yet processed.

*Id.* at 25-27.  The 2019 Deposit Account Agreement was in effect in June 2020, when the fraudulent check scheme giving rise to this case occurred.[3]

      b.  *The Fraudulent Check Scheme*

On June 8, 2020, an individual purporting to be Julio Gomez, President of Tools & Equipment Supply, retained Plaintiff PLA to collect a $199,550 debt from Derbyshire Machine & Tool Co.  *See* Emails between Gomez and N. Perlberger, Mot. Summ. J., Ex. G, ECF 31-9.  After reaching out to an individual allegedly representing Derbyshire to collect the debt, PLA received a signed check in the amount of the debt owed: $199,550.00.  N. Perlberger Dep. 91:12-17; 105:8-16.  The check appeared to be a Citibank cashier's check payable to the order of "Perlberger Law Associates, P.C."  Mot. Summ. J., Ex. I, Check Image; N. Perlberger Dep. at 105:11-16.

On June 17, 2020, Hanna Perlberger of PLA visited a Bala Cynwyd branch of Wells Fargo with the intention of depositing the check into PLA's Interest on Lawyers' Trust Account.  H.

---

[3] The excerpted terms from the 2019 Agreement quoted above are substantially similar to the provisions in the 2013 Agreement that was in effect when Plaintiffs opened the accounts.  *See* Ex. D, 2013 Business Account Agreement at 82, 93, 97, 99, 101-03.

Perlberger Dep. 61:16-63:3, 75:14-16.  She was not permitted to enter the branch office due to COVID-19.  *Id*. at 71:4-7.  A Wells Fargo bank officer instead directed Perlberger to deposit the $199,500 check into an ATM machine.  *Id.* at 66:9-18.  She deposited the check and received a receipt indicating that the deposit had been successful.  *Id.* at 76:17-77:1.  The receipt stated that $400 would be made available immediately and that $199,150.00 would be available on Thursday, June 18.  ATM Receipt, Mot. Summ. J., Ex. J, ECF 31-12.

The following day, June 18, 2020, Plaintiffs checked their online banking and saw that deposited funds in the amount of $199,550.00 were "available."  N. Perlberger Dep. 122:4-10; PLA Account Statement, Mot. Summ. J., Ex. K, ECF 31-13.  Plaintiff therefore made an appointment at the Rosemont Wells Fargo branch to wire the funds.  N. Perlberger Dep. 124:3-16.  Plaintiffs had received wire instructions from Tools LLC.  *Id.* at 106:23-108:12, 109:12-110:8.  Hanna Perlberger took the written wiring instructions to the branch and handed them to a Wells Fargo employee, Tarik Kanan.[4]  H. Perlberger Dep. 93:10-15, 99:1-14.  Mr. Kanan asked her, "do you have any other numbers?" and when she said no, told her, "I'm going to have to check something."  *Id*. at 93:19-94:3.  He got up and left and then returned shortly thereafter.  *Id.*  When she asked him if everything was okay, he again said, "yes, I just have to check something" and then, "it's fine."  *Id.* at 94:4-10; H. Perlberger Affidavit ¶ 5, Pl.'s Resp., Ex. 19, ECF 34-20.  He then printed a new set of wire instructions for Ms. Perlberger to review and compare with the initial instructions.  *Id*. at 102:20-103:7.  She compared the instructions, confirmed their accuracy, and signed a Wire Transfer Agreement.  *Id.* at 104:3-21.  The Wire Transfer Agreement provides that, "you acknowledge that you are responsible for providing Wells Fargo with all information required

---

[4] Mr. Kanan is no longer employed by Wells Fargo.  Plaintiff's counsel issued and served a subpoena to appear at a deposition, but Mr. Kanan failed to appear.  Pl.'s Resp. at 22; Affidavit of Service, Pl.'s Resp., Ex. 21, ECF 34-22.

by the Beneficiary's bank." Wire Agreement, Mot. Summ. J., Ex. L, ECF 31-14. It also contains a limitation of liability provision: "In no event will Wells Fargo be liable for damages arising directly or indirectly if the order is executed by Wells Fargo in good faith and in accordance with the terms of this agreement." *Id.* It further advised that the "the order will be final and will not be subject to stop payment or recall." *Id.* Unbeknownst to Plaintiffs, the wire instructions ultimately directed the funds to Guaranty Bank in Nigeria. H. Perlberger Dep. 126:21-127:1; Answer ¶ 18, ECF 13.

Four days later, on June 22, 2020, Citibank, the putative issuer of the check, notified Wells Fargo that it would be returning the check unpaid. K. Nelson Dep. (Feb. 17, 2022), 40:1-8; 42:5-14, Mot. Summ. J., Ex. M, ECF 31-15. Wells Fargo mailed Plaintiff a letter indicating that it was "delaying the availability of the funds" because the signature on the Derbyshire check was forged and Citibank had notified Wells Fargo that the check would be returned unpaid. *Id*. at 40:1-8, 42:5-14; Wells Fargo Letter to PLA, Mot. Summ. J., Ex. N, ECF 31-16.[5] The bank then charged PLA's operating account in the amount of $199,500, which resulted in an overdraft, as the prior balance of the operating account had been $160,254.34. K. Nelson Dep. 20:10-21:25, 57:2-1, 59:1-8; PLA Account Statement at 1.

## II.     Standard of Review

A motion for summary judgment is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

---

[5] The letter was dated June 22, 2020 and postmarked June 23, 2020. K. Nelson Dep. 41:17-18.

**III.     Discussion**

A. Implied Contract Claim:

Bank accounts may be the subject of an express or implied contract under Pennsylvania law. *See Cohen v. Marian*, 90 A.2d 373, 376 (Pa. Super. Ct. 1952). In Pennsylvania, a claim for breach of contract requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). "The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." *Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015).

Plaintiffs allege that Wells Fargo incurred, and breached, myriad contractual duties including "accepting deposits . . . ONLY if the checks are genuine," "verifying all presented checks and holding them," "verifying all codes and wiring instructions," "matching the prospective recipient of wired funds to FATF lists of suspicious institutions," and "[e]mploying security and fraud detection measures that it advertised." Compl. ¶ 80.

At the Motion to Dismiss stage, the bank argued that Plaintiffs' contract claims were displaced by the Pennsylvania Commercial Code. It does not renew this argument now, arguing instead that summary judgment is appropriate because (1) the existence of express written agreements preclude the application of an implied contract theory; (2) there is no evidence of conduct that would support the existence of additional duties beyond the written agreements; and (3) Wells Fargo did not breach the terms of the express agreements. Def.'s Mem. at 13-14, ECF 31-1.

> *1. The existence of a written contract precludes argument based upon a theory of implied contract*

An implied contract cannot be found when the parties have an express agreement dealing with the same subject. *Baer v. Chase*, 392 F.3d 609, 617 (3d Cir. 2004); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986) ("The law will not imply a different contract than that which the parties have expressly adopted."). Here, there were express agreements—both the Deposit Account Agreement and the Wire Transfer Agreement—that defined the terms of the parties' relationship. "It is well established that the legal relationship between a financial institution and its depositors is based in contract, and that the contract terms are contained in the signature cards and deposit agreements." *First Fed. Sav. & Loan Ass'n v. Office of the State Treasurer*, 669 A.2d 914, 915 (Pa. 1995).

Courts have routinely held that a party who signs an account application clearly incorporating another document by reference is bound by that document, even if it is not signed. *See, e.g., Brandywine Prof'l Servs., LLC v. Quigley*, No. CV 13-2865, 2015 WL 6598537, at *4 (E.D. Pa. Oct. 30, 2015) (holding that a party who signs a "Signature Cards and New Business Account" form stating that it "agrees to be bound by the terms of the applicable Deposit Account Agreement(s), as may be revised or amended from time to time," is bound by that agreement); *In re Est. of Atkinson,* 231 A.3d 891, 899 (Pa. Super. 2020) (enforcing terms of unsigned account agreement specifically referenced in account application signed by plaintiff). *See also Southwestern Energy Production, Co. v. Forest Resources, LLC,* 83 A.3d 177, 187-88 (Pa. Super. 2013) (terms in separate documents incorporated by reference in a written contract constitute terms of that contract); *Standard Bent Glass Corp. v. Glassrobots Oy,* 333 F.3d 440, 447 (3d Cir. 2003) ("Incorporation by reference is proper where the underlying contract makes clear reference to a

9

separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship.")

Here, although the Deposit Account Agreement was unsigned, the signed account application specifically and clearly incorporates the account agreement. Moreover, Ms. Perlberger does not dispute the authenticity of her signature or that her signature on the application constituted agreement to be bound by the applicable account agreement. H. Perlberger Dep. 37:17-38:7. It is also undisputed that PLA regularly used both accounts, which, under the terms of the application, operates to confirm receipt of, and agreement to be bound by, the account agreement.

Plaintiffs' Response in Opposition argues they never received copies of the agreements and were not informed orally about the agreements, so they are not bound by them. As a threshold issue, this assertion is not supported by the record, which reflects that Plaintiffs do not recall receiving a copy of the account agreement, but that they may have been given a brochure, some disclosure, or "a few pieces" in total.[6] Moreover, even had they testified more definitively that they did not receive copies, it would be insufficient to raise a genuine issue of material fact where the parties are both attorneys, presumably sophisticated parties with knowledge about contracts, and their undisputedly authentic signatures appear on a document affirming that their use of the accounts confirms their receipt of, and agreement to be bound by, the account agreement. *See Brandywine,* 2015 WL 6598537, at *4 (noting that contention that party never received a copy of the Deposit Account Agreement is insufficient to raise a genuine issue of material fact under the law). *Accord, Standard Bent Glass,* 333 F.3d at 447, n. 10.

Therefore, Plaintiffs are bound by the terms of the Account Agreement, which govern the obligations for handling deposits, funds availability, withdrawals, and delays. Similarly, the

---

[6] *See* discussion *supra* note 1.

parties are bound by the terms of the Wire Agreement that Ms. Perlberger signed, which governs the parties' responsibilities as to the Wire Transfer.

    2. *The Implied Duty of Good Faith Does Not Overcome the terms of an Express Contract*

Next, Plaintiffs argue that the "secreted" nature of the agreements, as well as the fact that they were modifiable at will "suggests a bad faith strategy on the part of Wells Fargo to produce such a document just for this very purpose, a secret cloak of invincibility." Pl.'s Resp. at 7. Plaintiffs further argue that the bank may not disclaim its duty to act in good faith and ordinary care and that an implied duty of good faith and fair dealing overcomes the express agreements.

This argument fails for several reasons. First, Wells Fargo does not dispute that it is bound to act in good faith. *See* Def.'s Reply at 8, ECF 35 ("Wells Fargo agrees that it must exercise ordinary care and behave in good faith when performing under the Deposit Account Agreement and the Wire Transfer Agreement."). In fact, the express terms of the contracts incorporate a duty to act in good faith. Second, although the agreement was modifiable, the terms of the 2013 agreement, in effect at the time the account was opened, are substantially similar to the 2019 agreement in effect at the time of the underlying events. Finally, and most fundamentally, even though every Pennsylvania contract imposes a duty of good faith in its performance and its enforcement, *Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 242 (Pa. Super. 2000), the implied duty of good faith "cannot be used to override an express contractual term" as a matter of law. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000); *see also Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Tr.* Co., 560 A.2d 151, 154 (Pa. Super. 1989) ("The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given . . . by the terms of its contract."); *Reading Terminal Merchants Ass'n by Asteris v. Samuel Rappaport Assocs.*, 456 A.2d 552, 557 (Pa. Super. 1983) ("There can be no

implied covenant as to any matter specifically covered by the written contract between the parties."). Here, the conduct that Plaintiffs challenge is permitted by the terms of the express contracts, so any claim of a heightened implied duty of good faith necessarily fails.

    *3. There is No Evidence in the Record to Support the Existence of an Implied Contract*

Aside from the legal obstacles faced, Plaintiffs have also failed to point to any evidence in the record sufficient to support the existence of an implied contract. "A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings." *Ingrassia Const. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. 1984). While "[o]ffer and acceptance need not be identifiable and the moment of formation need not be pinpointed" the circumstances must "show a mutual intention to contract." *Id.* (citations omitted).

First, Plaintiffs assert that, had the deposit been made with a teller, rather than an ATM, the check would have received additional screening and the fraud may been detected prior to deposit.[7] They then point to the fact that a Wells Fargo employee, Jennifer Gill, directed Plaintiff to deposit the check through the ATM, as creating an implied contract.[8] Plaintiffs seek to rely

---

[7] Plaintiffs list an excerpt from Wells Fargo employee Karen Nelson's deposition in their response describing the fact that the ATM did not have the intelligence to compare the payee to the depositor and that if the check passed the risk screening criteria, it would not have human eyes looking at the check. Pl.'s Resp. at 12. However, Plaintiff's fail to attach that portion of Ms. Nelson's deposition to their motion. Therefore, it is not properly part of the record before me. Nevertheless, even had it been attached, there is no suggestion that Ms. Gill's direction to deposit the check through the ATM was made in bad faith or that the treatment of the check violated the policies governing ATM deposits.

[8] The record is unclear as to exactly what the employee said to Ms. Perlberger as her deposition on this topic is fragmented: "I didn't realize that I couldn't enter the bank just to make this deposit. [Ms. Gill] told me to use the ATM machine. I said it's a really, really large check; just don't worry about it, receipt—take a picture of the check." H. Perlberger Dep. 66:13-18. Plaintiffs represent that, at trial, Ms. Perlberger would "testify that Ms. Gill told her she had nothing to worry about, since she would get a picture of the check on the ATM receipt." Pl.'s Resp. at 13 n. 4.

In addition, while neither party briefs this issue, the record reflects that Ms. Perlberger testified that she had the "option of going to an ATM machine or going to a teller that was through a window with a tube, but the cars were backed up onto Levering Mills Road." H. Perlberger Dep. 66:20-67:2, Pl. Resp., Ex. 2. She

upon Mr. Perlberger's affidavit to argue that had the check been presented to a bank teller, the teller would have physically examined the check and optically and electronically scanned it to verify that it was authentic with the proper coding. Ex. 8, N. Perlberger Affidavit. Mr. Perlberger does not purport to have expertise in banking, and his lay assertions about bank procedures and fraud detection are insufficient to establish an implied contract. Moreover, there is nothing in the record to suggest that Mrs. Perlberger's interaction with Ms. Gill, the teller on duty at the time of the deposit, created an implied contract. Specifically, there is no evidence that Ms. Gill made representations about the type of screening that the check would be subject to or that Mrs. Perlberger inquired about or received assurances regarding fraud or screening from Ms. Gill.

Next, Plaintiffs point to the fraud section of the Wells Fargo website as a source of duty for an implied contract. Specifically, they rely on the portion of the website that provides:

> In the fight against fraud, there's no silver bullet. You're best protected when you and your bank use a layered approach. At Wells Fargo, the security of your assets is a top priority and we're committed to protecting your company's financial information and assets. We're proactively advancing our security to identify new threats and help ensure the safety of your accounts and information. We use multiple layers of protection to keep your company's information and accounts secure. As fraud becomes more sophisticated, so does our approach to security—an our investment in advanced security tools using the latest technology helps us protect your accounts and detect when there may be a risk.

Screenshot, Pl.'s Resp., Ex. 13, ECF 34-14. Such vague promises of a "layered approach" are insufficiently specific to create an implied contract. *See Ryan v. Temple Univ.*, 535 F. Supp. 3d 356, 369 (E.D. Pa. 2021) ("Vague or aspirational statements cannot form the basis for an enforceable agreement where there is no indication that the parties intended to enter into a bargain.") (cleaned up). In addition, setting aside the vagueness, the screenshot here is dated

---

chose to use the ATM, given the direction from Ms. Gill and the long wait for the drive through window teller. *Id.*

October 11, 2021, and Plaintiffs point to no evidence in the record to establish that this language was present on the Wells Fargo website prior to the purported breaches in June 2020. Finally, even if a contract could be implied by the website, Plaintiffs point to no specific fraud prevention methods that Wells Fargo promised but then breached in its handling of the check or wire transfer.

Plaintiff further argues that Defendant breached an implied contract related to the wire transfer. Specifically, Plaintiff states that Mr. Kanan telling her that he had to check something, and getting up and leaving her alone for a short time before returning to tell her that "it's fine," was sufficient to create an implied contact or a duty that fraud prevention had been taking place. Plaintiffs speculate that Mr. Kanan was checking through an automated process that the wire had been approved, but there is no evidence in the record as to what Mr. Kanan was doing when he left, what he needed to check, or what was "fine." This is insufficient to show a meeting of the minds or the formation of an implied contract. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990) (noting that an "inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."). Plaintiffs also assert that Defendant breached an implied duty by not sharing with Ms. Perlberger that the wire's final destination was Nigeria. But there is no evidence in the record to establish that the ultimate location was displayed or known to Mr. Kanan at the time of the transfer.[9] The first

---

[9] Plaintiffs state that in Wells Fargo employee "Jonathan Goldman's deposition, he testified that, if Guaranty Bank of Nigeria was the beneficiary bank it would have shown up on the computer screen." Pl.'s Resp. at 22, ECF 34, citing Goldman Dep. 76-77, ECF 34-7. Again, the record is not that clear. A review of Mr. Goldman's deposition reveals that Mr. Perlberger asked him, "would something appear on your screen that would indicate that the funds are going to the Guaranty Bank of Nigeria?" He replied "If that's the SWIFT code for that bank, it would show on the screen." On the Wire Transfer Form, the SWIFT Code box is blank. Pl.'s Resp., Ex. 16, ECF 34-17. Wells Fargo witness Karren Nelson testified that "the routing number for the bank was Citibank. We have a New York address. The beneficiary name also had a US address. So there was absolutely nothing that told Wells Fargo that these funds were going outside of the US." K. Nelson Dep. 80:14-18. In fact, Mr. Perlberger's affidavit agrees that "Citbank, the recipient of the wire, was the correspondent bank, acting as a conduit for the funds transmitted to Nigeria." Perlberger Aff. ¶ 5, Pl.'s Resp., Ex. 8, ECF 34-9.

mention of Nigeria in the record appears to be on June 23, 2020, the day after the check was returned. Pl.'s Resp., Ex. 20., ECF 34-21, entitled "Taxonomy."

    *4. There is No Evidence of Any Breach of the Express Contracts:*

Finally, there is no evidence in the record of a breach of express contractual terms. First, Plaintiffs assert that Wells Fargo failed in its duty to physically inspect the check, including verification of the routing numbers. But the Deposit Agreement provides that Wells Fargo need not physically examine the checks deposited in the ATM. Deposit Agreement at 18 ("processing by automated means. . . does not require [Wells Fargo] to examine item.").[10] Plaintiffs also point to a section of the Deposit Agreement titled "Protection against unauthorized items" that states that, for "analyzed accounts," services include "positive pay with validation" and "ACH filter." *Id.* at 16. Analyzed accounts are a specific type of business checking account that can have advantages for businesses that tend to hold higher cash balances. Wells Fargo asserts that these analyzed account services are optional, and that Plaintiffs do not provide any evidence that their accounts are analyzed accounts. Def.'s Reply at 7, ECF 35. Plaintiffs point to no evidence that they chose an analyzed account, either in their initial response to the motion or their sur-reply. Absent such evidence, Plaintiffs cannot rely upon these provisions in the Account Agreement.

Next, Plaintiffs argue that Wells Fargo breached its duty to delay availability of the funds or place the funds on hold. As an initial matter, it should be noted that the Expedited Funds Availability Act, 12 U.S.C. §§ 4001 *et seq.*, limits the length of time that a bank can place a hold

---

[10] Plaintiffs also argue that the fact that the check has been destroyed merits an adverse inference, asserting the existence of a thirty-day retention policy, which was not followed here. Pl.'s Resp. at 11. Once again, the record is not so clear. *See* K. Nelson Dep. 34:14-16; 35:1-2. ("I'm not positive of the exact timeframe for a deposited check through the ATM. I know it's no longer than 30 days; I know it's a very short window… I don't know exactly what the timeframe is; it could be several days, it could be up to 30 days"). Regardless, the record contains a photo of the front and back of the check.

on deposited funds. Federal Reserve Regulation CC generally requires depository banks to make funds deposited by check available for withdrawal no later than the business day after the deposit but permits longer delays in limited circumstances. *See* 12 C.F.R. §§ 229.10(c), 229.13. The Account Agreement provides that the bank's policy is to make funds available the next day. While Plaintiff makes much of the fact that the size of the check could have merited a delay in availability or a hold, the contract language is discretionary. *See* Deposit Agreement at 26 ("funds you deposit by check *may* be delayed for a longer period of time. . . [where] we believe a check you deposit will not be paid [or] you deposit checks totaling more than $5,000 on any one day.") (emphasis added). Here, Wells Fargo made the funds available the next day, in keeping with its stated policy and the general rule established by Regulation CC. Having discretion to delay availability did not obligate Wells Fargo to exercise that discretion.

Plaintiff next argues that Wells Fargo breached its duties by marking the funds as available and then rescinding that availability when it deducted the amount after the check was returned. This is Plaintiff's most compelling argument, as it is decidedly confusing to have funds marked as available that are later clawed-back. This is a classic example of how a word used in common parlance can have a significantly different meaning when contractually defined. Here, the Agreement allows Wells Fargo to "deduct the amount of the deposited or cashed item from your account. . . when we are notified that the item will be returned … We can do this even if you have withdrawn the funds and the balance in your account is not sufficient to cover the amount we hold or deduct and your account becomes overdrawn." Deposit Agreement at 24-25. Such actions are authorized by the Pennsylvania Commercial Code ("PCC"), which provides that when a check is deposited, any credit given is provisional and may be "charge[d] back" if the check is returned unpaid. *See* 13 Pa.C.S.A. §§ 4201(a) and 4214(a). The Agreement expressly allowed Wells Fargo

to deduct the amount, even if doing so would result, as here, in an overdraft. Wells Fargo followed its stated policies: when Wells Fargo received notice from Citibank that the check would be unpaid, it promptly issued a hold and a letter alerting Plaintiffs to the hold. There is no evidence in the record to establish bad faith or a contractual breach.

Finally, there is also no evidence that Wells Fargo breached the express terms of the Wire Transfer Agreement. The Agreement does not require Wells Fargo to verify or assess the wire information. There is a waiver of liability if Wells Fargo executes the order in good faith and there is no evidence in the record that the transfer was made in bad faith. And the Agreement advises that the transfer is final.

### IV.  Conclusion

The situation in which Plaintiffs find themselves is deeply regrettable, stemming from a confluence of unfortunate events. In a sad irony, the admirable efficiency with which they acted to distribute funds to their "client" contributed to their being victimized. But they have not advanced a theory of recovery for which there is a remedy recognized by law, and I am obligated to grant summary judgment against them. An appropriate order follows.

    /s/ Gerald Austin McHugh
United States District Judge